**LEHMAN BROTHERS INC., Plaintiff,**

v.

**CITY OF LODI, Lodi Financing Corporation, and Does 1 through 50, Defendants.**

**No. CIV. S–040850FCDJFM.**

United States District Court, E.D. California.

Aug. 20, 2004.

---

Helen L. Duncan, Fulbright & Jaworski LLP, Los Angeles, CA, for Plaintiff.

Gregory D. Call, Folger Levin & Kahn, San Francisco, CA, for Defendants.

### MEMORANDUM AND ORDER

DAMRELL, District Judge.

This matter is before the court on Lehman Brothers Inc.'s ("Lehman") motion to remand pursuant to 28 U.S.C. § 1447. Lehman contends defendants City of Lodi and Lodi Financing Corporation (collectively, the "City") improperly removed this action because Lehman's wholly state law claims do not, as the City maintains, (1) arise under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") or any other federal law; (2) attack or undermine a federal court judgment or settlement; or (3) require resolution of threshold CERCLA issues. Lehman thus moves this court to remand the action to San Joaquin County Superior Court, from which it was removed, on the basis of lack of subject matter jurisdiction. Lehman further seeks its attorneys' fees and costs incurred as a result of the removal. 28 U.S.C. § 1447(c).

The court heard oral argument on the motion on July 9, 2004. For the reasons set forth below, Lehman's motion is DENIED; its request for attorneys' fees and costs is, accordingly, likewise DENIED.[1]

## BACKGROUND

### 1. *Relevant History* [2]

In April 1989, the City first detected tetrachloroethene ("PCE") in a water sample from a new water tank. Subsequent testing found PCE contamination in the groundwater and several Lodi water wells. In March 1992, the Central Valley Regional Water Quality Control Board ("RWQCB") issued a report identifying a Lodi cleaning business as one potential source of PCE-contaminated wastewater discharged into the City's sewer lines and suspected as a source of the soil and groundwater contamination.

In 1993, the California State Department of Toxic Substance Control ("DTSC") commenced an investigation of the contamination. In 1994, DTSC initiated an administrative action against selected potentially responsible parties, including the City, to address the soil and groundwater contamination.

Thereafter, on May 6, 1997, the Lodi City Council authorized the City Manager to execute a "Comprehensive Joint Cooperative Agreement" ("Cooperative Agreement") with DTSC concerning the investigation and abatement of hazardous substance contamination within the City. Under the Cooperative Agreement, DTSC was required to act with the City

---

**1.** As a result, the City's motion to dismiss, currently set for hearing before this court on October 1, 2004, shall proceed as scheduled. (Minute Order, filed July 13, 2004.)

**2.** The history is necessary to place Lehman's state court action in context. The description is drawn, in part, from the court's December 22, 2003 order in the related case of *Fire-*

*man's Fund Ins. Co. v. City of Lodi,* Civ. S–98–1489 FCD/JFM ("Fireman's Fund Action"). *Fireman's Fund Ins. Co. v. City of Lodi,* 296 F.Supp.2d 1197 (E.D.Cal.2003). A more detailed history describing the contamination within the City of Lodi is recounted in *Fireman's Fund Ins. Co. v. City of Lodi,* 302 F.3d 928 (9th Cir.2002).

in a consolidated effort, providing the oversight, consultation, and cooperation necessary and appropriate to ensure the contamination site was remediated in a timely, competent, and cost-effective manner. In exchange for DTSC's "ongoing and substantial services," the DSTC received in excess of one million dollars.

Since the discovery of the contamination, the City has faced the issue of potential liability. Indeed, the Cooperative Agreement expressly stated that DTSC may have certain claims against the City for the design, construction, operation, and maintenance of its sewer system. Despite this acknowledgment of potential liability, the Cooperative Agreement specifically designated Lodi the "lead enforcement entity," in place of the DTSC, and obligated the City to "cause a prompt, comprehensive, and cost-effective investigation and remediation" of the ground and soil contamination.

To support the City's lead enforcement role, the Cooperative Agreement also required the "prompt enactment and enforcement of a comprehensive municipal environmental response ordinance."[3] Just ninety days later, on August 6, 1997, Lodi's City Council enacted the Comprehensive Municipal Environmental Response Ordinance ("MERLO"), which sets forth a remedial liability scheme partially modeled on CERCLA.

MERLO provided the City with municipal authority to investigate and remediate existing or threatened environmental nuisances affecting the City and to hold responsible parties or their insurers liable for the cost of Lodi's nuisance abatement activities. MERLO incorporated many of CERCLA's standards. Specifically, MERLO borrowed CERCLA's definition of (1) who may be considered a "potentially responsible party" ("PRP"), (2) who may avoid liability by proving certain affirmative defenses, and (3) who may impose joint and several liability on responsible parties. However, in significant departures from CERCLA, MERLO's liability scheme did not provide a mechanism for responsible parties to impose costs upon the City for its share of any attributable costs but did provide the City recovery for a broad range of "action abatement costs,"[4] including attorneys' fees and the costs the City incurred servicing and retiring financing it obtained to fund its enforcement activity (including, particularly, the financing from Lehman described below).

In 1998, the City approached Lehman to devise a means to finance the City's environmental enforcement activities related to its soil and groundwater contamination problem. (Lehman's Compl., filed March 30, 2004, ¶ 21.) In November 1999, the City adopted a resolution approving the financing agreements it intended to enter into with Lehman. (*Id.* at ¶ 23.) In December 1999, the City then defended the proposed financing arrangement in a contested validation proceeding in San Joa-

---

**3.** Under the Cooperative Agreement, the City's "enforcement activities" include "the prompt enactment and enforcement of a comprehensive municipal environmental response ordinance which shall enact into municipal law additional legal authorities to appropriately supplement the City of Lodi's ... authority under federal, state and local law."

**4.** MERLO defines "action abatement costs" to include: (a) "any and all legal, technical or administrative fees and costs," (b) "interest and other costs of financing incurred by the city," (c) "expert assistance in health, law, engineering and environmental science," (d) "expert witness services," (e) "legal fees (including, but not limited to, internal costs of the city attorney's office or outside legal counsel deemed necessary at the sole discretion of the city)," and (f) "costs of issuing, servicing, and retiring of any financing instruments authorized by the city council." *Fireman's Fund Ins. Co.,* 296 F.Supp.2d at 1215 (citing MERLO §§ 8.24.010(2)(a)-(h))..

quin County Superior Court, pursuant to California Civil Code § 860 *et seq.,* ultimately obtaining a ruling that the financing arrangement was valid as a matter of law. (*Id.* at ¶s 26–27.) On, May 19, 2000, the superior court entered a permanent injunction enjoining all persons from challenging the financing arrangement. (*Id.* at ¶ 29.) In June 2000, the City and Lehman entered into a series of related agreements (collectively, the "Investment Contract").

Subsequently, on November 2, 2000, the City filed the case of the *People of the State of California and the City of Lodi v. M & P Investments, et al.,* Civ. S–00–2441 FCD/JFM ("M & P Action"), alleging claims under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a)(1)(B), and state law nuisance on behalf of the "People of the State of California" and cost recovery claims under the California Water Code and MERLO on behalf of the City, against numerous defendants, including various dry cleaning businesses, who were allegedly responsible for the soil and groundwater contamination within the City.

## 2. *The Investment Contract*

The Investment Contract includes a Program Receipts Sale and Repurchase Agreement ("Sale and Repurchase Agreement"), a Trust Agreement, a Certificate Purchase Contract, a Placement Agent Agreement, and a Professional Services Agreement.[5] (Exs. A–C to City's FAC, filed July 9, 2004, in Civ. 04–606.) Of central importance here is the Sale and Repurchase Agreement executed between the City of Lodi and Lodi Financing Corporation ("LFC"). (*Id.* at Ex. B.) LFC is the intermediary created under the agreement to sell the certificates and to receive the proceeds under the terms of the Sale and Repurchase Agreement between LFC and Lehman as the original purchaser. Under this agreement, the City assigns its rights to receive "Program Receipts"[6] to LFC, which were the monetary recoveries (the "Program Receipts") it would recover from responsible parties or their insurers pursuant to the City's environmental enforcement "Program."[7] LFC would then reconvey the Program Receipts to the City in return for the City's promise to make the repurchase payment to the holders of the certificates (Lehman). Importantly, according to the terms of the Investment Contract, the City could not retain any Program Receipts (other than certain limited deductions) until the repurchase price for all "Program Receipts" is paid in full.[8] The consideration for the sale of the "Pro-

---

5. The Investment Contract's structure based on certificates of participation ("COP") is not uncommon. It is a means by which an entity can borrow money in return for assigning its rights to a particularly defined revenue stream; the obligation to pay revenue is usually secured by assets of the entity. What is unusual here is that the only source of repayment for the purchasers of the COPs is the proceeds from litigation, and the only security being revenues that may be recovered in the litigation by settlement or judgment. Thus, as a practical matter, the purchasers of the COPs (Lehman) are speculating on the outcome of litigation.

6. "Program Receipts" is defined as: "all amounts, proceeds and recoveries from, or in contemplation of, or in connection with, the potential liability of responsible parties or potentially responsible parties, their insurers or indemnitors, or of tortfeasors or potential tortfeasors, their insurers or indemnitors, received by the City ... on or after January 30, 1999, or received by the City's Outside Counsel after the Closing Date, in connection with the Program, whether in cash or non-cash form and regardless of how such amounts, proceeds, or recoveries may be characterized ... in any judgment, award, settlement ...." (*Id.* at Ex. B, Article I–Definitions, p. 12.)

7. Said program is defined below at page 18.

8. Specifically, the City covenanted "that, until all Outstanding Certificates and the Deferred Commitment Fee have been fully paid and the

gram Receipts" by the City to LFC is the promise to convey to the City the proceeds from the sale of the COPs as those sale proceeds are received less the "Placement Fee" of $1,000,000 due Lehman, which is to be paid to Lehman out of the initial proceeds from the sale of the COPs. The total COPs that can be drawn down is $16,000,000. The interest rate is 20% plus LIBOR (an agreed upon to be determined rate of interest) with the total interest not to exceed 30%. (*Id.*) Pursuant to the Investment Contract, Lehman provided the City with nearly $16 million. (Lehman's Compl., ¶ s 31–33.)

### 3. *City/Lehman Litigation*

On March 26, 2004, the City filed a lawsuit against Lehman seeking a judicial declaration, on several grounds, that it is not obligated to repay to Lehman the financing of its environmental remediation litigation.[9] Four days thereafter, on March 30, 2004, Lehman filed an action against the City in the San Joaquin County Superior Court. On April 28, 2004, the City removed the action to this court.

In its action, Lehman alleges that the City's obligation to repay Lehman is "absolute and unconditional," and not abated, waived, diminished or otherwise modified

for any reason. (*Id.* at ¶ 45.) In particular, Lehman alleges that in instituting the above-described declaratory relief action seeking to have the Investment Contract declared void and invalid, the City has violated the state court injunction and anticipatorily breached their agreements. (*Id.* at ¶ s 76, 91–97.) Lehman further alleges the City has breached certain specific provisions of their Investment Contract,[10] giving rise to both breach of contract and breach of the covenant of good faith and fair dealing claims. (*Id.* at ¶ s 81–88.) Finally, Lehman alleges the City made numerous misrepresentations in order to obtain Lehman's funds during the course of the Investment Contract. (*Id.* at ¶ 103–113.)

On these grounds, Lehman alleges seven claims for relief against the City: (1) violation of state court injunction; (2) breach of contract; (3) anticipatory repudiation of contract; (4) breach of the covenant of good faith and fair dealing; (5) negligent misrepresentation; (6) fraud and deceit; and (7) money had and received.

### STANDARD

A civil case may be removed to federal court if the district court has original federal question jurisdiction. 28 U.S.C.

---

Purchase Commitment has been reduced to zero, it will diligently pursue collection of Program Receipts, will ... engage competent legal counsel ... and will not terminate the Cooperative Agreement or cause the Cooperative Agreement to be terminated." (*Id.* at Ex. B, § 6.15, p. 27.)

9. A description of the facts underlying the City's declaratory relief action is set forth in the court's memorandum and order, filed June 30, 2004, denying Lehman's motions to recuse the undersigned in this case and in the City's declaratory relief action. (Mem. & Order, filed June 30, 2004, in Civ. Nos. 04–606 and 04–850.) On July 9, 2004, the City filed a first amended complaint expanding on its declaratory relief claim and alleging additional state law claims for restitution, unfair busi-

ness practices, breach of contract, and civil conspiracy.

10. Said provisions include the following: (1) in causing the Cooperative Agreement to be terminated (§ 6.15 of the Sale and Repurchase Agreement); (2) in repudiating the obligations under the financing agreements by filing an action seeking to declare the agreements unlawful (*Id.* at § 9.1(f)); (3) in failing to defend Lehman's interest in the Program Receipts (*Id.* at § 6.2); (4) in failing to maintain competent outside counsel (*Id.* at § 6.15); (5) in misrepresenting the finality of the state court validation order (§§ 6(b), (c), (e), (h) and 8(d)(18) of the Purchase Contract and § 3 of the Placement Agent Agreement); and (6) in failing to comply with reporting and notice obligations (§ 9 of the Purchase Contract).

§ 1441(b). Federal district courts have original jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. The party invoking removal bears the burden of establishing federal jurisdiction. *Harris v. Provident Life and Acc. Ins. Co.*, 26 F.3d 930, 932 (9th Cir.1994). In the Ninth Circuit, courts apply "a strong presumption against removal jurisdiction." *Emrich v. Touche Ross & Co.*, 846 F.2d 1190, 1195 (9th Cir.1988) (federal jurisdiction must be rejected if there is any doubt as to the right of removal).

As a general rule, the court determines the existence of removal jurisdiction by considering the allegations on the face of the plaintiff's "well-pleaded complaint." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987).[11] However, this general rule does not apply when the plaintiff attempts to defeat removal by using "artful pleading" to characterize or disguise a federal claim as a state claim. *Ethridge v. Harbor House Restaurant*, 861 F.2d 1389, 1393 (9th Cir.1988). When the plaintiff has "artfully pleaded" his claims, the district court may examine the entire record to determine the true nature of the claims, regardless of the plaintiff's characterization thereof. *Federated Dep't Stores, Inc.*

*v. Moitie*, 452 U.S. 394, 397 n. 2, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981).

Thus, courts have found that a state created cause of action can be deemed to arise under federal law "(1) where federal law completely preempts state law[;] (2) where the claim is necessarily federal in character[;] or (3) where the right to relief depends on the resolution of a substantial, disputed federal question." *ARCO Environmental Remediation, L.L.C. v. Dept. of Health & Environmental Quality of the State of Montana*, 213 F.3d 1108, 1114 (9th Cir.2000) (internal citations omitted).

## ANALYSIS

On its face, Lehman's complaint does not state a claim that "arises under" federal law. California law creates the causes of action for breach of contract (and related contract claims) and fraud, under which Lehman has chosen to seek relief. Lehman has not stated a claim under CERCLA.

Nevertheless, the court must determine whether Lehman in stating its facially, "wholly state laws claims" has *artfully pleaded* a federal claim as a state law claim. Specifically relevant to this case is the second category described above— "where the [state] claim is necessarily federal in character."[12] *Id.* In this case, the

---

**11.** In a footnote in its opposition, the City contends that the well-pleaded complaint rule does apply here since the City bases the propriety of removal, not on Section 1331, but on the "separate" and "independent" jurisdictional grant of Section 113(b) of CERCLA. (Opp'n, filed June 25, 2004, at 9 n. 3.) As support, the City cites *American Nat'l Red Cross v. S.G.*, 505 U.S. 247, 258, 112 S.Ct. 2465, 120 L.Ed.2d 201 (1992) wherein the United States Supreme Court found that the well-pleaded complaint rule had no applicability in that case because jurisdiction was based upon the Red Cross Charter's "sue and be sued" provision, a "separate and independent jurisdictional grant," not on Section 1331's statutory "arising under" jurisdiction. *American Nat'l Red Cross* is inapposite. It did

not involve a jurisdictional grant under a federal statute. Additionally, the City's argument ignores the Ninth Circuit's recent decision in *ARCO Environmental Remediation, L.L.C. v. Dept. of Health & Environmental Quality of the State of Montana*, 213 F.3d 1108, 1113–14 (9th Cir.2000) which specifically considered Section 113(b)'s jurisdictional grant *and applied* the well-pleaded complaint rule.

**12.** The City does not contend that CERCLA completely occupies the field of environmental regulation such that the first *ARCO* category would confer jurisdiction in this case, and correctly so. *ARCO*, 213 F.3d at 1114 ("CERCLA does not completely occupy the field of environmental regulation"). Addi-

question presented is whether Lehman's complaint raises claims "necessarily federal in character," in that they present a "challenge" to CERCLA, thus supplying subject matter jurisdiction over Lehman's complaint.

### 1. *Jurisdiction Under CERCLA Section 113(b)*

■ With limited exceptions not applicable here, Section 113(b) of CERCLA confers on the federal district courts "exclusive original jurisdiction over all controversies arising under [CERCLA]." 42 U.S.C. § 9613(b). The Ninth Circuit has held that jurisdiction under Section 113(b) is "more expansive than ... those claims created by CERCLA," and "cover[s] any 'challenge' to a CERCLA cleanup." *Fort Ord Toxics Project, Inc. v. California Envtl., Protection Agency,* 189 F.3d 828, 832 (9th Cir.1999) (internal quotation marks omitted).[13] Thus, Section 113(b)'s jurisdictional grant is not limited to claims created by CERCLA, but can extend to purely state law claims. *Id.*

A year later, in *ARCO,* the Ninth Circuit expanded on the general principles set forth in *Fort Ord* for determining whether, under Section 113(b), state law claims constitute a "challenge" to a CERCLA cleanup. 213 F.3d at 1115. In *ARCO,* plaintiff ARCO, a PRP, brought an action in state court against the Montana Department of Health and Environmental Quality ("Department") to obtain documents pertaining to an ongoing CERCLA cleanup and to enjoin closed-door meetings between the Department and the EPA; ARCO's claims were based on state laws, including the Montana Constitution and Montana's open meeting and public access to records laws. *Id.* at 1113. The Department removed the case to federal court, arguing that ARCO's claims arise under CERCLA and that ARCO artfully pleaded a federal claim as a state claim. *Id.* In reversing the district court's denial of ARCO's motion to remand, the Ninth Circuit held that a state law claim constitutes a "challenge to a CERCLA cleanup" "if it is related to the goals of the cleanup." *Id.* at 1115.

> We have found actions to challenge CERCLA cleanups where the plaintiff seeks to dictate specific remedial actions[;] to postpone the cleanup[;] to impose additional reporting requirements on the cleanup[;] or to terminate the RI/FS and alter the method and order of cleanup.

*Id.* (internal citations omitted.) In this respect, the court considered whether the relief sought by ARCO "alter[ed] cleanup requirements or environmental standards." *Id.; see also Fort Ord,* 189 F.3d at 831 (finding that "Congress did not want

---

tionally, the court does not reach the latter basis described in *ARCO,* concerning whether state law claims present a "substantial, disputed federal question" because, as set forth below, the second *ARCO* category supplies jurisdiction in this case.

13. *See also Bolin v. Cessna Aircraft Co.,* 759 F.Supp. 692, 715 (D.Kan.1991), *cited with approval in, Fort Ord,* 189 F.3d at 832. In *Bolin* the court noted:

[T]he federal courts have exclusive original jurisdiction *'over all controversies arising under this Act, ....'* Significantly, Congress did not limit the grant to 'all claims' or 'all civil actions on claims' arising under

CERCLA, which might indicate that jurisdiction extends only to those claims created by CERCLA. Instead, the statute authorizes jurisdiction over 'all controversies' arising under CERCLA ... Congress intended this statute to authorize federal jurisdiction over all claims comprising the entire 'controversy'—without regard to the party who is asserting the claim or whether this party has only state claims.

On this basis, the *Bolin* court extended pendent party jurisdiction over the plaintiff's adult children with state law claims that "derive[d] from the same circumstances giving rise to the ... [CERCLA] claims of the [plaintiff] homeowners." *Id.* at 715–16.

§ 113(h)[14] to serve as a shield against litigation that is unrelated to disputes over environmental standards"). The court emphasized that "an action does not become a challenge to a CERCLA cleanup simply because the action has an incidental effect on the progress of a CERCLA cleanup," rather there must be a *direct* effect for state claims to constitute a CERCLA "challenge." *Id.*

Ultimately, the court held that ARCO's claims did not present a CERCLA challenge because the suit did not relate to the goals of CERCLA; rather the suit pertained to the public's right of access to information about the cleanup which did not impact CERCLA cleanup requirements or environmental standards. *Id.* at 1115. The court additionally found that ARCO's claims did not seek to "terminate or delay" the existing CERCLA cleanup. *Id.*

### 2. *Interpretation of ARCO*

Lehman contends that *ARCO requires* this court to find that its state court action seeks to "alter [CERCLA] cleanup requirements or environmental standards" in order to assert jurisdiction pursuant to Section 113(b). According to Lehman, because its complaint involves contractual and tort disputes "unrelated" to environmental standards or goals of CERCLA, this court does not have jurisdiction. On the other hand, the City argues that *ARCO* does not require such a constricted finding, or alternatively, that *ARCO* must

be read in light of the more expansive language of *Fort Ord*.[15]

 The court finds that the holding of *ARCO* does not support the narrow reading offered by Lehman. A state law claim that "alters" CERCLA cleanup requirements or environmental standards is not the only type of state law claim encompassed by Section 113(b). As expressly set forth in *ARCO*, the claims cited therein present a non-exhaustive list of claims which confer Section 113(b) jurisdiction. *Id.* at 1115.

For example, under *ARCO*, Section 113(b) jurisdiction can also extend to state law claims that "postpone" or delay a CERCLA cleanup. *Id.* (noting fact that ARCO's claims did not seek to delay or terminate the CERCLA cleanup); *see also Razore v. The Tulalip Tribes of Washington*, 66 F.3d 236, 239–40 (9th Cir.1995) (finding delay a basis for holding plaintiffs' RCRA and Clean Water Act claims a "challenge" to CERCLA); *Fort Ord*, 189 F.3d at 832 (accord as to plaintiffs' California Environmental Quality Act claims). Such claims constitute CERCLA "challenges" if "related" to the "goals" of CERCLA cleanups. *Razore*, 66 F.3d at 239–40.

Lehman's contract-related claims are dissimilar to the claims raised by the plaintiffs in *ARCO*, *Razore*, and *Fort Ord* in that Lehman's *claims* do not delay an ongoing CERCLA cleanup of the Lodi

---

14. CERCLA Section 113(h) postpones federal jurisdiction over "any challenges to removal or remedial action[s]" taken under CERCLA. 42 U.S.C. § 9613(h). Thus, citizens cannot challenge pending removal or remedial actions, but must wait to file suit until after such actions are completed. *McClellan Ecological Seepage Situation v. Perry*, 47 F.3d 325 (9th Cir.1995).

15. The City also argues that this court should disregard *ARCO* as "wrong," and instead fol-

low the Ninth Circuit's decision in *Fort Ord*. The City's argument is unpersuasive on two bases: First, *ARCO* is controlling law in this district, and unless distinguished, must be followed; second, *ARCO* represents the Ninth Circuit's most complete discussion of the parameters of Section 113(b) jurisdiction, as respecting district court jurisdiction over otherwise-denominated state law claims; *Fort Ord*, on the other hand, pertained to jurisdiction under Section 113(h), an entirely different jurisdictional provision.

site. However, under *ARCO* that fact does not conclude the jurisdictional inquiry. Lehman's claims are, primarily,[16] based upon the failure to perform the terms of the Investment Contract, which require a specific priority of payments disallowed by CERCLA (but specifically permitted by MERLO), that, in turn, allegedly delayed cleanup. The question then becomes whether such claims present a CERCLA "challenge" under the parameters of *ARCO*. This is an issue of first impression.

### 3. Whether Lehman's Contract–Related State Claims Raise A CERCLA "Challenge"

#### a. The Necessity of Ongoing CERCLA Cleanup

Preliminarily, the court finds that, contrary to Lehman's suggestion, jurisdiction under Section 113(b) is not contingent upon the existence of an *ongoing* CERCLA cleanup. Although *Fort Ord* and *ARCO* involved ongoing cleanups, the courts' holdings were not predicated on that fact. Rather, the courts focused on the relationship of the state law claims to CERCLA's goals and statutory requirements. Indeed, in *Razore*, the court found a CERCLA "challenge," in the Section 113(h) context, even though there was no ongoing CERCLA cleanup; there, only a Remedial Investigation/Feasability Study was in place to determine an appropriate remedial plan under CERCLA. 66 F.3d at 239–40.

While there is presently no ongoing CERCLA cleanup at the Lodi contamination site, CERCLA concerns have overlaid the site and the related litigation. Indeed, it is because there has been virtually no cleanup for years that CERCLA concerns have become pervasive. For example, from its inception, the M & P Action has involved counterclaims, cross-claims, and third and fourth-party claims for cost recovery and contribution under CERCLA. Importantly, while the City chose not to pursue CERCLA claims but rather state law nuisance claims, until recently, the Ninth Circuit made clear in its decision in *Fireman's Fund Ins. Co. v. City of Lodi*, 302 F.3d 928, 946 n. 15 (9th Cir.2002) that "litigants may not invoke state statutes in order to escape the application of CERCLA's provisions in the midst of hazardous waste litigation." Now, after retention of new counsel, with leave of the court, the City has amended its complaint to include CERCLA contribution claims. (City's Second Amend. Compl., filed Aug. 4, 2004.)

Moreover, the Investment Contract has, according to the defendants in the M & P Action, stalled the remediation of the site. (*See e.g.* Defs.' Jack Alquist, Guild Cleaners, Inc. and Estate of Dwight Alquist, deceased's Resp. to Court's Jan. 16, 2004 Mem. & Order, filed March 8, 2004, at 18–20.) According to the defendants, Lehman's control over the M & P Action has been a "roadblock to settlement" because defendants were unwilling to pay money in settlement which would go directly to Lehman, in the first instance, rather than to cleanup; such a circumstance would leave defendants vulnerable to actions by other

---

**16.** Lehman's complaint also alleges claims for violation of state court injunction, fraud and negligent misrepresentation. Should the court find that Lehman's contract-related claims present a CERCLA challenge under Section 113(b), the court may properly exercise supplemental jurisdiction over Lehman's tort claims. 28 U.S.C. § 1367 ("in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action that they form part of the same case or controversy under Article III of the United States Constitution.")

defendants or state or federal agencies because payments would not be directed to remediation of the site. (*Id.; see also* City's Resp. Regarding Role of Lehman Brothers in the Litigation, filed March 5, 2004, in the M & P Action.)

Thus, it is in the context of years of delay in the cleanup of the Lodi site, despite pending CERCLA claims, that this court properly considers, under Section 113(b), both the Investment Contract and Lehman's complaint.

### b. MERLO and the Investment Contract

Contrary to Lehman's contentions, the Investment Contract appears inextricably intertwined with the City's enforcement of MERLO. The Investment Contract expressly defines the City's "abatement [cost] [P]rogram" to include:

> all Abatement Actions *(as defined in the Ordinance [MERLO],)* undertaken in connection therewith, which include but are not limited to study, investigation, abatement, removal, remediation or response to an Environmental Nuisance *(as defined in the Ordinance [MERLO])* . . . including litigation and other actions against [PRPs], . . . and shall also include all activities related thereto, *whether or not expressly described in the Ordinance [MERLO],* . . . , including litigation and other actions against potential tortfeasors, their indemnitors or insurers.

(City's FAC, Ex. B at pp. 11–12 (emphasis added).)

The court has found in the related Fireman's Fund Action that the premise of MERLO violated CERCLA to the extent that it allowed the City to shield itself from the consequences of CERCLA and elevated the "financial interests of [the City,] its attorneys, and *others,* above the priorities of environmental cleanup and the prompt resolution of disputes." *Fireman's Fund Ins. Co.,* 296 F.Supp.2d at 1218 (emphasis added). The court reached this conclusion based on the primary objectives of CERCLA which include "effectuat[ing] quick cleanups of hazardous waste sites" and "encouraging voluntary private action to remedy environmental hazards." *Id.* at 1217; *Pinal Creek Group v. Newmont Mining Corp.,* 118 F.3d 1298, 1304 (9th Cir.1997) (In enacting the 1986 amendments to CERCLA, Congress sought to expedite effective remedial actions and minimize litigation.)

As a result, the court *enjoined* the City from "enforcing or invoking MERLO . . . to collect 'action abatement costs' against any person who is a PRP at the site of contamination." *Id.* at 1219. Action abatement costs included "costs associated with Lodi's financing scheme [the Investment Contract] for its litigation." *Id.* at 1217. MERLO clearly conflicted with CERCLA because, as this court found, "Congress intended that cost recovery be limited to cleaning up the environment, not provide an opportunity to profit at the expense of the environment" and "[u]nfortunately, MERLO provides just such an opportunity." *Id.*

In its above ruling, the court implicated the Investment Contract as well:

> Indeed, MERLO's cost recovery scheme generates the opportunity for a financial windfall for . . . Lehman Brothers, Inc., an investment bank, which has no interest in cleaning up the contaminated site. This profit-seeking concept of cost recovery is the polar opposite of CERCLA and is in direct violation of the goals and objectives set by Congress.

*Id.* at 1218. Consistent with MERLO, the Investment Contract elevates re-payment of Lehman above cleanup of the contaminated site. As an example, under the Investment Contract, "Program Receipts" are subject to the following order of priority:

(1) to indemnify Lehman for any legal claims arising from the financing;

(2) to pay currently accruing interest on the loan;

(3) to pay compounded interest on the loan;

(4) to pay the principal on the loan; and

(5) to pay the deferred commitment fee to Lehman, with any remaining funds returned to the City to use as it sees fit.

(Sale and Repurchase Agreement, Ex. B to City's FAC, § 6.7(a)(vi); Trust Agreement, Ex. C to City's FAC, § 5.04.) Thus, by asserting a claim of breach based on the City's failure to perform under the Investment Contract, Lehman places in issue the very terms which require subordination of cleanup.

### c. Application of Section 113(b)

█ Lehman argues that even if the Investment Contract requires subordination of cleanup, Lehman's contract claims are irrelevant to recovery of "Program Receipts" because said claims seek contract damages from "any source," not just from "Program Receipts," in the event of default.[17] The court disagrees.

While, under the terms of the Investment Contract, Lehman's remedies appear unfettered by a specific source of repayment, the contract, itself, may nevertheless be violative of the goals of CERCLA. Indeed it would be ironic if a party to the Investment Contract, could not circumvent CERCLA by invoking state law, but could do so by private agreement. Clearly, contractual remedies which allow damages through state law claims for failure to enforce such payment priorities do not trump considerations of CERCLA. While the language of such contractual *remedies* appears unrestricted by CERCLA, the parties' contractual *duties* under the Investment Contract, may well be restricted.

Additionally, the fact that Lehman does not specifically seek to enforce the Investment Contract does not change the above analysis. In asserting its breach of contract claims, Lehman relies on the failure to perform the very terms which appear to circumvent the goals of CERCLA. Thus, the jurisdictional issue does not turn on whether Lehman has stated a claim for breach or for specific performance; rather, the question is whether the *contract terms* which prioritize payment present a CERCLA challenge.

The Investment Contract was the financing vehicle permitting the City to launch the M & P Action which has since foundered on a series of court decisions. In quest of "Program Receipts" pursuant to the Investment Contract, the City repeatedly and vigorously declared to this and other courts that it was an "innocent" party suing, as the "People of the State of California" or as the City, seeking to impose joint and several liability on responsible parties. As well documented in several judicial decisions, this fragile premise has collapsed, leaving Lehman with little prospect of recouping its investment through specific performance. *See e.g. Fireman's Fund Ins. Co. v. City of Lodi,* 302 F.3d 928 (9th Cir.2002); *Fireman's Fund Ins. Co. v. City of Lodi,* 296 F.Supp.2d 1197 (E.D.Cal.2003); *City of Lodi v. Randtron,* 118 Cal.App.4th 337, 13 Cal.Rptr.3d 107 (2004). Thus, in light of these rulings, specific performance of the Investment Contract would appear futile, if not impossible.[18]

---

**17.** Section 9.2 of the Sale and Repurchase Agreement provides "[i]t being understood that amounts payable by the City upon an Event of Default caused by the City shall not be limited to Program Receipts." (City's FAC, Ex. B, p. 31.)

**18.** Lehman's counsel admitted in oral argument that Lehman is in a "better position"

Nonetheless, Lehman seeks damages for breach of the Investment Contract in state court. Such a claim, however, must be heard in this court. The ill-fated strategy to reorder CERCLA priorities, propelled by the Investment Contract, which launched the four year odyssey of the Lodi site litigation has caused significant delay in remediation as well as a diversion of substantial resources from cleanup. Such purposeful conduct represents a radical challenge to CERCLA under Section 113(b). Such a challenge compels this court to exercise jurisdiction. *ARCO*, 213 F.3d at 1115 (a state court action raises a CERCLA "challenge" where it has a "direct" effect rather than an "incidental effect on the progress ·of a CERCLA cleanup").

As a result, the court finds Lehman's contract-related claims have "artfully pleaded" a federal question as state law claims, namely whether the Investment Contract constitutes a "challenge" to CERCLA. That question is properly decided by this court under the jurisdiction afforded it by Section 113(b).[19]

## CONCLUSION

For the foregoing reasons, Lehman's motion to remand is DENIED. No attorneys' fees or costs are awarded on the motion.

IT IS SO ORDERED.

since the City has (allegedly) breached their agreements. (R.T., July 9, 2004, 30:9–10.)

**19.** As indicated above, the court thus has supplemental jurisdiction over Lehman's tort claims for fraud as they are part of the "same case or controversy" for purposes of Section 1367.