**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 20-1712**

WEST VIRGINIA STATE UNIVERSITY BOARD OF GOVERNORS,

Plaintiff - Appellee,

v.

THE DOW CHEMICAL COMPANY; UNION CARBIDE CORPORATION; BAYER CORPORATION; BAYER CROPSCIENCE LP; BAYER CROPSCIENCE HOLDING, INCORPORATED; RHONE-POULENC, INCORPORATED, RHONE-POULENC AG COMPANY; RHONE-POULENC AG COMPANY, INC.; AVENTIS CROPSCIENCE USA, LP,

Defendants - Appellants.

Appeal from the United States District Court for the Southern District of West Virginia, at Charleston. John T. Copenhaver, Jr., Senior District Judge. (2:17-cv-03558)

Argued: September 21, 2021                    Decided: January 10, 2022

Before GREGORY, Chief Judge, NIEMEYER, and RICHARDSON, Circuit Judges.

Affirmed by published opinion. Chief Judge Gregory wrote the opinion, in which Judge Niemeyer and Judge Richardson joined.

**ARGUED:** Kasdin Miller Mitchell, KIRKLAND & ELLIS LLP, Washington, D.C., for Appellants. Benjamin James Hogan, BAILEY & GLASSER LLP, Morgantown, West Virginia, for Appellee. **ON BRIEF:** Douglas J. Kurtenbach, Nader R. Boulos, Daniel I. Siegfried, KIRKLAND & ELLIS LLP, Chicago, Illinois; Floyd E. Boone, Jr., BOWLES RICE, LLP, Charleston, West Virginia, for Appellants. Samuel A. Hrko, Victor S. Woods, Charleston,

West Virginia, Brian A. Glasser, BAILEY & GLASSER LLP, Washington, D.C., for Appellee.

---

GREGORY, Chief Judge:

This case deals with groundwater contamination on land owned by West Virginia State University ("WVSU"), a historically Black university, which is adjacent to a 433-acre industrial park located in Institute, West Virginia that consists of a chemical manufacturing plant and wastewater treatment unit (the "Institute Facility"). The suit asserts several state and common law claims and seeks that Defendants adopt remedial measures, beyond those recommended by the U.S. Environmental Protection Agency ("EPA"), to address contamination on property owned by WVSU. On July 7, 2017, Defendants removed the action to federal district court invoking federal question jurisdiction, diversity jurisdiction, and federal officer jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332, 1441, 1442, and 1446. On August 7, 2017, Plaintiff filed a motion to remand to state court. On June 1, 2020, the district court granted Plaintiff's motion to remand. Dow Chemical appealed. We conclude that the district court did not err in holding that neither 28 U.S.C. §§ 1442 nor 1331 confer federal jurisdiction over WVSU's claims. For the following reasons, we affirm the district court's ruling.

I.

A.

In 1890, WVSU received a land grant from the U.S. Congress. Beginning in 1943, the Institute Facility was owned by the federal government who used it as a synthetic rubber production plant during World War II. J.A. 220. Then, in 1947, the Union Carbide Corporation ("UCC") purchased the Institute Facility and began manufacturing various

3

hydrocarbon and agricultural products. J.A. 80–81. In May 2013, the West Virginia Department of Administration ("WVDA") transferred the former West Virginia Rehabilitation Center ("Rehabilitation Center") to WVSU, which extended WVSU's property so that it was immediately adjacent to the Institute Facility. J.A. 83. The Rehabilitation Center is in the southeastern part of the campus with the Institute Facility immediately bordering it to the southwest and the Kanawha River to the south.[1] *See* J.A. 230; *see also* J.A. 270 (Map); J.A. 385 (Map). Between 1986 until 2015, the Institute Facility was owned and operated by various companies, including Rhone-Poulenc, Inc. (1986-2000), Aventis (2000-2002), and Bayer CropScience (2002-2015). J.A. 83. In 2015, Bayer CropScience returned control of the Institute Facility to UCC, which was a subsidiary of the Dow Chemical Company. *Id.* The Institute Facility is currently owned and operated by UCC, as a subsidiary of the Dow Chemical Company.

B.

In November 1984, UCC applied to the EPA and the West Virginia Division of Natural Resources ("WVDNR"), which is part of the West Virginia Department of Environmental Protection ("WVDEP"), for a permit to operate hazardous waste management units, pursuant to the Resource Conservation and Recovery Act, 42 U.S.C.

---

[1] The 433-acre facility is an industrial park located between the Kanawha River to the south, West Virginia State Route 25 (WV 25) to the north, UCC Private Trucking Operations (PTO) to the west, and West Virginia State University (WVSU) to the east. *See* J.A. 230 (Map of Institute Facility). The facility consists of two distinct areas: the main chemical plant and the wastewater treatment unit (WWTU). These areas are separated by approximately 0.5 mile of intervening properties that include an Appalachian Power Company (APCO) transformer substation, aggregate dock, and undeveloped land owned by UCC and containing Solid Waste Management Unit (SWMU) 19.

4

§ 6901 *et seq.* ("RCRA").  J.A. 226.  In August 1984, the EPA published a report documenting environmental pollution from multiple sources located within the Kanawha Valley.  *See West Virginia State University Board of Governors v. The Dow Chemical Company et al.*, No. 2:17-cv-3558 (S.D. W. Va. June 8, 2020), at Dkt. No. 3 at Exhibit 16 (Overview of Environmental Pollution in the Kanawha Valley, Aug. 1984).[2]  The report described that there was "groundwater contamination at the Institute Facility."  J.A. 23–24 at ¶ 10.  Accordingly, "in 1984, the EPA initiated a corrective permitting action to identify and remediate solid waste management units ("SWMUs") at the facility."  *Id.* at ¶ 11.  In June 1985, UCC submitted an initial list of potential solid waste management units, which was modified in September 1986.  *Id.*  In July 1988, the EPA issued a 1-year conditional operating permit to then-owner Rhone-Poulenc, and, in November 1988, the EPA issued a final permit requiring investigation for potential migration of hazardous wastes from certain SWMUs at the facility.  J.A. 24.  Then in, February 1990, the EPA issued a 10-year operating permit effective until January 21, 2001.  In December 1990, the EPA issued a revised final Corrective Action ("CA") permit, effective January 1991, to govern investigation and remediation activities relating to contamination emanating from the facility.  J.A. 24.  As the Defendants put it:  "[t]he EPA's Corrective Action Permit for the Institute Facility made clear that '[t]he Permittee must comply with all terms and conditions of this permit' and that 'permit noncompliance . . . is grounds for enforcement action' against the owner of the facility."  J.A. 24 (citing *West Virginia State University Board of*

_____

[2] A copy of the exhibit was not provided in the joint appendix.

5

*Governors v. The Dow Chemical Company et al.*, No. 2:17-cv-3558 (S.D. W. Va. June 8, 2020), at Dkt. No. 3 at Exhibit 18 (USEPA Permit for Corrective Action, Dec. 18, 1990)).[3]

Since 1988, and as part of the permitting process, the EPA instituted various corrective actions at the Institute Facility to address groundwater contamination. *See* J.A. 226; *see also* J.A. 25 ("beginning in 1996, groundwater delineation and remediation work were performed at multiple areas at the facility").[4] In 2014, the EPA's final permit for the Institute Facility required, among other things, submission "to EPA, for approval, documentation that the subsurface conditions and contaminant plume have been adequately characterized and the proposed corrective measures will adequately remove, contain or treat the released hazardous wastes or hazardous constituents." J.A. 241. The permit also required compliance with all its "terms and conditions" and "[a]ll plans, reports, schedules

---

[3] A copy of the exhibit was not provided in the joint appendix.

[4] In their motion for removal, Defendants stated that:

> [r]emediation efforts at the facility have included, among other things, implementation of air sparging and soil vapor extraction systems and ground water extraction wells. Contaminated material from the solid waste management units was also excavated and disposed of off-site. A 'USEPA-sitewide groundwater monitoring program has been in place since 2011.' It has been 'updated with a revised program in 2014 to 1) determine if concentrations in impacted areas are stable or decreasing; 2) monitor the site perimeter; 3) document water quality improvement; 4) detect and respond to changes in site conditions; and 5) identify areas where additional active remediation may be necessary.' Currently, the EPA is involved in the final stages of remediation and is considering proposed final corrective measures at the facility and adjoining properties.

*See* J.A. 26 at ¶ 16-17.

and other submissions" that the EPA approves.  J.A. 257.  Since 1988, the various owners of the Institute Facility have been required to comply with the corrective measures including groundwater delineation and remediation work and studies under the supervision of the EPA.  *See, e.g.*, J.A. 226; J.A. 218 ("USEPA-approved sitewide groundwater monitoring program has been in place since 2011").

## C.

In May 2010, the West Virginia Department of Education transferred the Rehabilitation Center property to the WVDA.  J.A. 24.

As part of its ongoing remedial measures, beginning in January 2013, the EPA conducted five phases of testing spanning four years which evaluated whether there was any risk to the Rehabilitation Center and whether remedial measures were necessary. Phase I investigated the Rehabilitation Center, which was immediately adjacent to the Institute Facility, and owned by the WVDA at the time.  J.A. 27.  On January 22, 2013, UCC signed an agreement with the WVDA to allow experts at CH2M Hill, a private engineering firm, to investigate activities at the Rehabilitation Center.  J.A. 265–70.  In March 2013, CH2M Hill reported the results of the Phase I study to the WVDA.  The Phase I study reported low levels of volatile organic compounds ("VOCs") in the groundwater running beneath the former Rehabilitation Center property and under portions of the remainder of WVSU property.  J.A. 28 (citing *West Virginia State University Board of Governors v. The Dow Chemical Company et al.*, No. 2:17-cv-3558, at Dkt. No. 3 at Exhibit 27 (J. Cibrik letter to G. Melton)).

In May 2013, WVDA transferred the property to WVSU. *See* J.A. 27–28 at ¶¶ 23, 27. At the time that they acquired the property, WVSU officials knew that there was groundwater contamination. *See* J.A. 273 ("University officials say they learned of the contamination about four years ago, when they took ownership from the state of the former West Virginia Rehabilitation Center.").

On August 5, 2013, CH2M Hill reported to the EPA, WVDEP and WVSU the results of its investigation in a technical memorandum. *See* J.A. 28 (citing *West Virginia State University Board of Governors v. The Dow Chemical Company et al.*, No. 2:17-cv-3558, at Dkt. No. 3 at Exhibit 29 (East Property Boundary Investigation at West Virginia State University, Aug. 5, 2013)); *see also* J.A. 371. According to the memorandum, there were contaminants migrating from the Institute Facility onto the WVSU property via the groundwater. *See* J.A. 377; J.A. 386 (showing a map of the water flow of contaminants beneath the WVSU campus). Notably, the memorandum stated that there was an elevated risk of exposure to contaminants at the WVSU property via "ingestion through drinking water and inhalation through [] occupied buildings." *Id.* However, CH2M Hill concluded that because "there are no drinking water wells on the WVSU property [,] there [was] no risk associated with ingestion through drinking water." *Id.* Still, the memorandum identified at least three VOCs and various other contaminants in the groundwater at concentrations that pose a carcinogenic risk for residential and commercial levels. However, because as of July 11, 2013, the buildings were unoccupied and "WVSU indicated it ha[d] no plans for residential reuse at this property," CH2M Hill determined

8

there was no risk to human health. Accordingly, CH2M Hill issued two recommendations to remedy the problem:

> Place an environmental covenant on the WVSU property prohibiting the use of groundwater and requiring a vapor barrier for new buildings constructed on the property. . . . [And] [p]lace an environmental covenant on the WVSU property prohibiting residential reuse.

J.A. 378. On April 2014, the EPA approved the CH2M Hill memorandum, including its findings and recommendations, and issued the Institute Facility a permit. J.A. 29; J.A. 275 (EPA stating that it "agrees with the conclusions presented in that report."). In 2014, under the ownership of defendant Bayer CropScience, the Institute Facility operated with a RCRA permit issued by WVDNR. *See* J.A. 282–368.

On September 30, 2014, WVSU executed an access agreement with CH2M Hill to conduct additional investigations. From October 2014 through January 2016, as part of Phases II-V of the EPA investigation, CH2M Hill collected additional data relating to the university campus, football complex and field, faculty residences, and agricultural facility with respect to the impact of groundwater contamination. J.A. 29.

On April 18, 2016, CH2M Hill submitted a report containing the results of the Phase II-V studies for EPA's approval. J.A. 416–429. On July 18, 2016, the EPA informed CH2M Hill that the EPA reviewed the Phase II through V report and that the EPA agreed with the conclusions presented in the report. *See* J.A. 432. Accordingly, on January 6, 2017, Dow Chemical submitted a Corrective Measures Proposal Amendment, dated December 2016, incorporating the recommendations and conclusions of the Phase II-V report. J.A. 434–476; J.A. 477–520. Of note, Dow Chemical's only remedy to address the

9

groundwater contamination impacting WVSU was to the obtain the environmental covenants proposed by CH2M Hill. *See* J.A. 489–90.[5]

From August 26, 2018, to September 26, 2018, the EPA conducted a 45-day comment period on Defendants' final CA permit and proposed remedial measures. *See* J.A. 558. During the comment period, WVSU submitted a letter stating that the EPA focused primarily on remedial measures at the UCC plant and that the environmental covenant was insufficient to remedy the groundwater contamination. J.A. 602. In response, the EPA stated that it considered the potential risks of groundwater contaminants onto WVSU's campus, but, because the Rehabilitation Center was not in use, there was no risk to human health. Moreover, the EPA stated:

> *Screening levels are not cleanup standards* but are used to determine if further evaluation of potential risks exist. . . . EPA determined no groundwater constituents pose current risk to human health at the University property because the University is on public water and groundwater beneath the University is not a drinking water source. In addition, EPA's Final

---

[5] Dow Chemical reported to the EPA that:

> Groundwater generally flows to the south-southwest at the facility toward the Kanawha River; however, along the facility's eastern property boundary there is a slight southeastern gradient towards the WVSU property (Figure 2-2) . . . . Groundwater data indicate that the [vapor intrusion] VI pathway relative to impacts from the Institute facility is incomplete with the exception of potential future residential-type use (e.g., homes, dormitories, daycare, or other) for the southwestern portion of WVSU property. As proposed (CH2M 2013c) and approved by USEPA in April 2014, potential risks from groundwater will be addressed by filing an EC [environmental covenant] that prohibits the construction of occupied structures over areas of identified VI risk unless a VI mitigation system is installed, and the EC restricts groundwater usage to remediation and monitoring only. UCC is working with WVSU to obtain an EC.

10

Remedy restricts groundwater use on the University property thereby eliminating future unacceptable exposures to groundwater.

J.A. 603 (emphasis added). On October 24, 2018, the EPA issued a final decision and final remedy and approved WVDEP to issue the CA Permit to UCC. J.A. 558–560. On February 22, 2019, the EPA issued a final CA Permit which constituted minimal compliance with the RCRA. *See* 40 C.F.R. § 270.4.

D.

Based on CH2M Hill recommendations, Defendants approached WVSU, along with other adjacent landowners, requesting that they sign an environmental covenant whereby they would refrain from using the groundwater. J.A. 32 at ¶ 39; J.A. 218–19. However, WVSU refused to sign the environmental covenant unless Defendants provided them with compensation. J.A. 32 at ¶ 39. When Defendants declined to pay, WVSU filed a lawsuit, on April 27, 2017, in the Circuit Court of Kanawha County in West Virginia alleging the following claims:

> Count I: Declaratory Judgment
> Count II: Preliminary and Permanent Injunctive Relief
> Count III: Negligence
> Count IV: Interference with Business Expectancy and Loss of Goodwill
> Count V: Public Nuisance
> Count VI: Private Nuisance
> Count VII: Trespass
> Count VIII: Strict Liability
> Count IX: Unjust Enrichment
> Count X: Punitive Damages

J.A. 54-73. Plaintiff requests the following remedies:

(1) Remove the Institute Plant Contaminants from the University's property;

11

(2) Install barriers to protect University facilities, including but not limited to buildings and athletic fields, from possible intrusions of the Institute Plant Contaminants;

(3) Install protective systems in all University buildings sufficient to ensure that, in the event the Institute Plant Contaminants enter the indoor environment in any building, they are removed or rendered harmless;

(4) Monitor the Institute Plant Contaminants on the University's property to ensure that no person is exposed to the Institute Plant Contaminants;

(5) Restore the University and its property to the condition it would have been in absent the Institute Plant Contaminants; and,

(6) Take all other steps necessary to eliminate any effects of the Institute Plant Contaminants.

J.A. 63–64 at ¶ 44. On July 7, 2017, Defendants removed the case to federal court based on federal officer removal jurisdiction and federal question jurisdiction. J.A. 18. On August 7, 2017, WVSU moved to remand the case to state court, and, on June 1, 2020, the district court granted WVSU's motion, concluding that it lacked subject-matter jurisdiction. J.A. 276. On June 30, 2020, Defendants filed a notice of appeal at the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit").

II.

We "review questions of subject matter jurisdiction *de novo*." *Dixon v. Coburg Dairy, Inc.*, 369 F.3d 811, 815–16 (4th Cir. 2004) (en banc) (quoting *Mayes v. Rapoport*, 198 F.3d 457, 460 (4th Cir. 1999)). This includes issues relating to removal. *Ripley v. Foster Wheeler LLC*, 841 F.3d 207, 209 (4th Cir. 2016). Generally, we may also "review a district court's jurisdictional findings of fact on any issues that are not intertwined with the facts central to the merits of the plaintiff's claims under the clearly erroneous standard of review and any legal conclusions flowing therefrom *de novo*." *U.S. ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 348 (4th Cir. 2009) (internal quotes omitted).

12

Recently, the Supreme Court clarified that "[28 U.S.C.] § 1447(d) permit[s] a court of appeals to review any issue in a district court order remanding a case to state court where the defendant premised removal in part on the federal officer removal statute." *BP P.L.C. v. Mayor & City Council of Baltimore*, 141 S. Ct. 1532, 1536 (2021). Therefore, we may consider whether jurisdiction exists under the federal officer removal statute, 28 U.S.C. § 1442, or under federal question jurisdiction, 28 U.S.C. § 1331.

This appeal primarily involves the application of the federal officer removal statute to private actors. Under the statute, private actors can remove a case to federal court when they: (1) acted under the direction of a federal officer; (2) have a colorable federal defense; and (3) are engaged in government-directed conduct that was causally related to the plaintiff's claims. *See Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 254 (4th Cir. 2017); *see also Jefferson Cty., Ala. v. Acker*, 527 U.S. 423, 431 (1999) (holding that, as to element three, the moving party must show that the suit is "for a[n] act under color of office," which requires a causal nexus "between the charged conduct and asserted official authority"). Section 1442(a)(1) is thus an exception to the well-pleaded complaint rule, which, absent diversity, prohibits removal unless a federal question appears on the face of the complaint. *See Jamison v. Wiley*, 14 F.3d 222, 239 (4th Cir. 1994) (citing *Mesa v. California*, 489 U.S. 121, 136–37 (1989)).

Furthermore, the Supreme Court has recognized that "[o]ne of the primary purposes" of federal officer removal is to provide a federal forum for a federal defense. *Willingham v. Morgan*, 395 U.S. 402, 407 (1969). Thus, proof of a "colorable" federal defense does not require the defendant to "win his case before he can have it removed" nor

13

even establish that the defense is "clearly sustainable." *Id.* Finally, "[d]efendants bear the burden of establishing jurisdiction as the party seeking removal." *Mayor & City Council of Baltimore v. BP P.L.C.*, 952 F.3d 452, 461 (4th Cir. 2020) ("*City of Baltimore I*") (citing *Dixon v. Coburg Dairy, Inc.*, 369 F.3d 811, 816 (4th Cir. 2004)).

### III.

### A.

On appeal, Defendant-Appellants argue that the district court erred in granting the motion to remand the action because, pursuant to § 1442, they (1) were "working hand-in-hand with EPA for decades, at EPA's direction, to assist the federal agency in remediating the Institute Facility—tasks that, if Defendants had not performed, the government would have to do itself"; (2) "it is undisputed that Defendants have a 'colorable federal defense': federal preemption of state law"; and (3) "WVSU's claims expressly challenge the adequacy of Defendants' remediation efforts—arguments the agency already rejected—and so 'relat[e] to' Defendants' performance of the EPA-directed cleanup." Op. Br. at 17–18.

In response, Plaintiff-Appellee argues that the district court did not err in finding that it did not have federal officer jurisdiction for the following reasons. First, Plaintiff argues that Defendants seek an impermissible expansion of § 1442(a)(1) based on an incorrect notion that if Defendants did not fulfil their "legal obligations by discharging the requirements of the subject RCRA permit, the federal government would be required to independently remediate via a cleanup under CERCLA." Resp. Br. at 16–17 (referencing

14

Op. Br. at 28–29). Accordingly, Plaintiff argues that Defendants' rationale incorrectly interprets Supreme Court precedent, seeks removal solely on the speculative possibility that the EPA could step in, and ignores Plaintiff's state claims which are in addition to, and separate from, the EPA's remedial measures. Resp. Br. at 18–19.

1.

Here, there is no question that if the Defendants were "acting under" the direction of a federal officer, they would have a colorable defense.[6] Thus, this case turns on whether Defendants were "acting under" the "subjection, guidance, or control" of the EPA such that Defendants were completing tasks on behalf of the federal government and that, without Defendants, the federal government would have performed itself. For the reasons stated below, we hold that Defendants were not acting under the "subjection, guidance, or control" of the EPA, and, thus, we affirm the district court.

---

[6] If we found that Defendants were acting under the authority or control of the federal government, then we would also find that Defendants had a colorable federal preemption defense, even if the defense would ultimately be unmeritorious. *See Ripley v. Foster Wheeler LLC*, 841 F.3d 207, 210 (4th Cir. 2016) ("Proof of a 'colorable' federal defense thus does not require the defendant to 'win his case before he can have it removed' nor even establish that the defense is 'clearly sustainable.'") (quoting *Willingham*, 395 U.S. at 407). The district court held similarly, and WVSU did not dispute this finding. J.A. 648; *Feikema v. Texaco, Inc.*, 16 F.3d 1408, 1416 (4th Cir. 1994) (holding that "when the EPA, acting within valid statutory authority of the RCRA and not arbitrarily, enters into a consent order, that order will also preempt conflicting state regulation, including a federal court order based on state common law."). Typically, it is sufficient for defendants to establish a colorable federal defense by stating that they "complied with all his federal law obligations." *Magnin v. Teledyne Cont'l Motors*, 91 F.3d 1424, 1429 (11th Cir. 1996).

15

a.

As an initial matter, we will clarify what it means for a private actor to "act under" the control and guidance of a federal officer for purposes of the removal statute. In *Watson v. Philip Morris Companies, Inc.*, the Supreme Court characterized the words "acting under" as broad and reasoned that the statute must be "liberally construed." 551 U.S. 142, 147 (2007) (quoting *Colorado v. Symes*, 286 U.S. 510, 517 (1932)). The Court clarified that such "broad language is not limitless [and that] a liberal construction nonetheless can find limits in a text's language, context, history, and purposes." *Id.*[7] Accordingly, the *Watson* Court determined that the basic purpose of § 1442(a)(1) is "to protect the Federal Government from the interference with its 'operations' that would ensue were a State able,

---

[7] According to the *Watson* court, the statute was first enacted by Congress at the end of the War of 1812 in response to shipowners filing state-court claims against federal customs officials charged with enforcing a trade embargo with England. *See The Reconstruction of Federal Judicial Power, 1863–1875*, 13 AM. J. LEGAL HIST. 333, 337 (1969). The statute permitted federal customs officers and "*any other person aiding or assisting*" those officers to remove a case filed against them "in any state court" to federal court. Customs Act of 1815, ch. 31, § 8, 3 Stat. 198 (emphasis added). As noted by the Supreme Court, this early statute was "[o]bviously . . . an attempt to protect federal officers from interference by hostile state courts." *Watson*, 551 U.S. at 147–49 (citing *Willingham*, 395 U.S. at 405). Then, in the 1830s, when South Carolina passed the Nullification Act, declaring federal tariff laws unconstitutional and authorizing prosecution of the federal agents who collected the tariffs, Congress enacted a new statute that permitted "any officer of the United States, *or other person*," to remove to federal court a lawsuit filed against the officer "for or on account of any act done under the revenue laws of the United States." Act of Mar. 2, 1833, ch. 57, § 3, 4 Stat. 633 (emphasis added). After the Civil War, Congress enacted another officer removal statute, permitting removal of a suit against any revenue officer "on account of any act done under color of his office" by the revenue officer and "*any person acting under or by authority of any such officer*." Act of July 13, 1866, ch. 184, § 67, 14 Stat. 171 (emphasis added). Finally, in 1948, Congress again revised the statute, dropping its limitation to the revenue context. *See* Act of June 25, 1948, ch. 646, § 1442(a), 62 Stat. 938, 28 U.S.C. § 1442(a).

16

for example, to 'arres[t]' and bring 'to trial in a State cour[t] for an alleged offense against the law of the State,' 'officers and agents' of the Government 'acting . . . within the scope of their authority.'" 551 U.S. at 142–43 (quoting *Willingham*, 395 U.S. at 406 (internal quotation marks omitted)). The Court reasoned that Congress wanted to protect the federal government, its officers, and those acting under its authority from state-court proceedings which may be filled with "local prejudice against unpopular federal laws or officials and States hostile to the Government [which] may impede enforcement of federal law, or deprive federal officials of a federal forum in which to assert federal immunity defenses." *Watson*, 551 U.S. at 142–43. Thus, the statute was meant to protect "private persons 'who lawfully assist' a federal officer 'in the performance of his official duty,' but 'only' if the private parties were 'authorized to act with or for [federal officers or agents] in affirmatively executing duties under . . . federal law.'" *Id.* (first quoting *Davis v. South Carolina*, 107 U.S. 597, 600 (1883); then quoting *City of Greenwood v. Peacock*, 384 U.S. 808, 824 (1966)).

Therefore, *Watson* defined "acting under" as a private person who is under the "'subjection, guidance, or control'" of a federal officer which "must involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior." *Watson*, 551 U.S. at 151–52 (emphasis in original) (quoting Webster's New International Dictionary 2765 (2d ed. 1953)). As such, § 1442(a) is meant to protect private persons acting under a federal officer and to protect the Federal Government from interference in such operations. *Ripley*, 841 F.3d at 210.

17

We have applied *Watson*'s definition of "acting under" to remove cases to federal court in matters involving private contractors working on behalf of the federal government—the archetype case. *See, e.g.*, *Watson*, 551 U.S. at 153–54 ("The assistance that private contractors provide federal officers goes beyond simple compliance with the law and helps officers fulfill other basic governmental tasks . . . . [that] the Government itself would [otherwise] have . . . to perform."); *Cty. Bd. of Arlington Cty., Virginia v. Express Scripts Pharmacy, Inc.*, 996 F.3d 243, 251 (4th Cir. 2021) ("a private contractor may 'act under' a federal officer when the relationship 'is an unusually close one involving detailed regulation, monitoring, or supervision'") (quoting *Watson*, 551 U.S. at 153); *see id.* (holding that pharmacies which contracted with Department of Defense were "acting under" a federal officer, as could support removal, because the pharmacies, through operation of mail-order program, provided services to members of the Department's health care program, and pharmacies were always subject to federal government's guidance and control with regard to operation of the mail-order program); *Sawyer*, 860 F.3d at 254 (a private contractor who died of mesothelioma allegedly caused by exposure to asbestos while assembling boilers for use aboard United States Navy vessels was "acting under" the control of the U.S. Navy because the U.S. directed the contractor on which warning labels to use.); *Hurley v. CBS Corp.*, 648 Fed. Appx. 299, 303 (4th Cir. 2016) (per curiam) ("GE

is a 'person acting under' a federal officer because it was acting under a valid government contract at all times relevant to the litigation.").[8]

[8] Our sister circuits have also found that when a private corporation works closely with the federal government by contract, to provide a service or product, then there is a sufficient nexus to find that the private actor is "acting under" federal "subjection, guidance, or control." *See, e.g.*, *Agyin v. Razmzan*, 986 F.3d 168, 176–177 (2d Cir. 2021) (holding that physician employed at federally deemed community health center pursuant to Federally Supported Health Centers Assistance Act (FSHCAA) acted "under a federal officer" because he performed job that, but for FSHCAA, the federal government would have had to perform itself, and he acted pursuant to employment contract with federally supported community health center); *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805 (3d Cir. 2016) (holding that an aircraft manufacturer acted under the direction of a federal officer when it did not warn of dangers associated with asbestos); *In re Commonwealth's Motion to Appoint Couns. Against or Directed to Def. Ass'n of Philadelphia*, 790 F.3d 457, 469 (3d Cir. 2015), *as amended* (June 16, 2015), *cert. denied*, (holding that the relationship between the Federal Community Defender and the federal government is a sufficiently close one to conclude that the Federal Community Defender was "acting under" a federal agency.); *Bennett v. MIS Corp.*, 607 F.3d 1076, 1086–87 (6th Cir. 2010) (holding that MIS Corporation, Inc. was acting under a Federal Aviation Administration officer when it was contracted to treat and remove the mold in the air control towers but failed to do so correctly); *Betzner v. Boeing Co.*, 910 F.3d 1010, 1015 (7th Cir. 2018) (holding that "Boeing acted under federal officers when it contracted to manufacture heavy bomber aircraft for the United States Air Force, and that it acted under the military's detailed and ongoing control."); *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012) (holding that the CBS corporation was "acting under" the federal government because it "worked hand-in-hand with the government, assisting the federal government in building warships."); *Jacks v. Meridian Res. Co., LLC*, 701 F.3d 1224, 1231-34 (8th Cir. 2012) (holding that a local insurance provider contracted under the FEHBA program to provide health care insurance for federal employees was acting under the federal government); *People of State of Cal. v. H & H Ship Serv. Co.*, 68 F.3d 481 (9th Cir. 1995) (holding that federal officer removal was warranted for a private defendant that was hired by the federal government to assist in conducting a CERCLA cleanup because the defendant was "supervised" and "approved" by the United States Coast Guard.); *Greene v. Citigroup, Inc.*, 215 F.3d 1336 (10th Cir. 2000) (holding that Defendant who implemented a remedy selected by the EPA, pursuant to CERCLA, and who was subject to civil penalties for failure to comply with that directive, was acting under the direction of a federal officer in a case where the Plaintiff was challenging the EPA directive).

On the other hand, we have also held that a private actor who merely has a contract with the federal government to produce or provide goods is not sufficient, on its own, to justify removal. Recently, for example, we held that a private company selling "standardized consumer product[s]" to the federal government did not implicate the federal officer removal statute. *Mayor & City Council of Baltimore v. BP P.L.C.*, 952 F.3d 452, 464 (4th Cir. 2020) ("*City of Baltimore I*"), *cert. granted*, 141 S. Ct. 222 (2020), and *vacated and remanded on other grounds*, 141 S. Ct. 1532 (2021) (holding that § 1447(d) permitted the court of appeals to review entire remand order and consider all the defendants' grounds for removal, not just part of order deciding the federal officer removal ground). In *City of Baltimore I*, we clarified that even when a contract specifies the details of the sales and authorizes the government to supervise the sale and delivery, the simple sale of contracted goods and services is insufficient to satisfy the federal officer removal statute.

The case at bar involves a different circumstance: a private actor subject to strict federal regulation who is required to perform certain remedial measures to obtain an operating permit. To guide our reasoning, we rely on *Watson* which carefully distinguished between entities subject to "intense regulation" and those "acting under" federal authority:

> The answer to this question lies in the fact that the private contractor is helping the Government to produce an item that it needs. The assistance that private contractors provide federal officers *goes beyond simple compliance* with the law and *helps officers fulfill other basic governmental tasks*. In the context of *Winters*, for example, Dow Chemical [party seeking removal] fulfilled the terms of a contractual agreement by providing the Government with a product that it used to help conduct a war. Moreover, at least arguably, Dow performed a job that, *in the absence of a contract with a private firm, the Government itself would have had to perform*.

20

*Watson*, 551 U.S. at 153–54 (emphasis added) (referring to *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387 (5th Cir. 1998)).  To further distinguish between mere compliance with federal law and "acting under" the federal government, *Watson* noted that on one end of the spectrum simple compliance with federal law or directives was insufficient.  For example, "taxpayers who fill out complex federal tax forms," "airline passengers who obey federal regulations prohibiting smoking," and "well-behaved federal prisoners" are not "acting under" federal officers.  *Id.* at 152.  These types of relationships do not warrant removal because state court prejudice would not be expected.

Moreover, *Watson* clarified that a private actor subject to highly detailed federal regulation, on its own, is also insufficient to qualify as "acting under" federal "subjection, guidance, or control."  For example, the *Watson* Court stated that:

> A private firm's compliance (or noncompliance) with federal laws, rules, and regulations *does not by itself* fall within the scope of the statutory phrase "acting under" a federal "official."  And that is so *even if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored*.  A contrary determination would expand the scope of the statute considerably, potentially bringing within its scope state-court actions filed against private firms in many highly regulated industries.

*Id.* at 153 (emphasis added).

In all, in evaluating whether a private actor is "acting under" federal "subjection, guidance, or control," we must first determine whether the private actor is merely complying with federal laws, regardless of how stringent and detailed the regulations may be.  Second, even if we find that a private actor's conduct goes beyond mere compliance with federal laws, we must then ask whether the private actor's conduct is helping or assisting federal officers fulfill a basic governmental task, under the government's control

21

or subjection, that the government would otherwise have to perform itself. *See Watson*, 551 U.S. at 152 (holding that "acting under must involve an effort to *assist*, or to help *carry out*, the federal superior's duties or tasks.") (emphasis in original); *but see Panther Brands, LLC v. Indy Racing League*, LLC, 827 F.3d 586, 590 (7th Cir. 2016) (holding that "merely being subject to federal regulations or *performing some functions* that the government agency controls is not enough to transform a private entity into a federal officer.").

b.

With these guideposts in mind, we now turn to examine the relationship between Defendants and the EPA with respect to the approved remedial measures, as part of its CA permit, to abate the groundwater contamination impacting WVSU.

Here, the relationship between Defendants and the EPA is one of statutory compliance and not contractual. Specifically, because the Institute Facility treats, stores, and disposes of hazardous wastes, it is subject to RCRA—a comprehensive set of waste prevention and management regulations administered by the EPA. *S.C. Dep't of Health & Envtl. Control v. Commerce & Indus. Ins. Co.*, 372 F.3d 245, 256 (4th Cir. 2004) (RCRA "attempts to deal with hazardous waste before it becomes a problem"). The goal of the RCRA is to "assur[e] that hazardous waste management practices are conducted in a manner which protects human health and the environment," by "requiring that hazardous waste be properly managed in the first instance thereby reducing the need for corrective action at a future date." 42 U.S.C. § 6902(a)(4)-(5).

To determine the relationship between Defendants and the federal government, as well as understand Defendants' responsibilities under law, we begin with the regulatory

22

framework. To operate the Institute Facility, Defendants must obtain a CA permit which provides "conditions necessary to achieve compliance with [RCRA] and regulations" including "conditions . . . necessary to protect human health and the environment." 40 C.F.R. § 270.32(b)(1)-(2). The operator of the site is responsible for investigating, reporting, and complying with the RCRA. *See* 40 C.F.R. § 270.4 ("Compliance with a RCRA permit . . . constitutes compliance . . . with [RCRA]."); 40 C.F.R. § 270.32(b). To obtain a permit, the applicant must "submit a [Proposal] to address the need for corrective action" at the facility. J.A. 321. As noted by the district court, "the Proposal 'develop[s] and evaluate[s] the corrective action alternative(s), provide[s] information on the effectiveness of interim measures implemented at the Facility, and recommend[s] corrective measure(s) to be taken at the Facility for approval by WVDEP.'" J.A. 645 (quoting J.A. 321–22). "If the [WVDEP] Project Manager and/or EPA determines . . . that corrective measures for releases of hazardous waste or hazardous constituents are necessary to protect human health or the environment" the Permittee will be advised of such determination in writing. J.A. 645 (quoting J.A. 322) (internal quotes omitted). After the applicant submits the proposal to the EPA and WVDEP, and they receive final approval, they must implement the remedial actions. Therefore, the EPA's supervision of the Institute Facility is limited, and governed, by the RCRA statutory framework. As the district court determined, "the oversight and supervision conducted by the EPA at the facility here is indicative only of defendants' minimum compliance with highly detailed

23

statutes and regulations applicable to all members of the industry related to hazardous waste." J.A. 647.[9]

Defendants' conduct has been limited to strict compliance with the RCRA regulations. Beginning in November 1984, UCC applied to the EPA and West Virginia Division of Natural Resources (WVDNR) for a RCRA permit to operate hazardous waste management units. J.A. 226. In 1988, the EPA issued a 1-year conditional operating permit, and, in February 1990, it issued a 10-year operating permit effective until January 21, 2001. *Id.* Over the next twenty years, the various owners of the Institute Facility have been required to comply with the corrective measures, including groundwater delineation and remediation, under the supervision of the EPA as part of their RCRA permitting. *See, e.g.*, J.A. 226; J.A. 218 ("USEPA-approved sitewide groundwater monitoring program has been in place since 2011").

Most recently, and as detailed above in Section I.C., *supra* at 7–11, beginning in January 2013, the EPA conducted five phases of testing across multiple years which evaluated whether there was any potential risk to the Rehabilitation Center and whether remedial measures were necessary. In March 2013, CH2M Hill reported low levels of

---

[9] Although not applicable in this case, the Institute Facility could also be subject to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9601 *et seq.* ("CERCLA" or "Superfund")—a remedial regulatory framework that "establishes a cleanup program for hazardous waste which has already been disposed of improperly." *Envtl. Tech. Council v. Sierra Club*, 98 F.3d 774, 779 (4th Cir. 1996); *see* 1 Toxic Torts Prac. Guide § 7:15 (2020-1) (CERCLA "triggered when mismanagement occurs"). CERCLA authorizes the President to act "to remove or arrange for the removal of, and provide for remedial action relating to such hazardous substance, pollutant, or contaminant." 42 U.S.C. § 9604. This duty of the President is delegated to federal agencies. 40 C.F.R. § 300.100.

VOCs in the groundwater running beneath the former Rehabilitation Center property and under portions of the remainder of WVSU property that posed a carcinogenic risk via "ingestion through drinking water and inhalation through VI into occupied buildings." J.A. 27–28; J.A. 265–70. However, CH2M Hill concluded that because the buildings were unoccupied by WVSU and there were no plans for residential use, there was no risk to human health and, thus, recommended an environmental covenant on the WVSU property to prohibit groundwater use. J.A. 378. On April 2014, the EPA approved the CH2M Hill memorandum, including its findings and recommendations and issued a CA permit to the Institute Facility. J.A. 29; J.A. 275. After CH2M Hill conducted additional studies of groundwater contamination at the Institute Facility, the EPA approved Defendants' proposed remedies, including the environmental covenant and, in 2018, issued a Final Remedy governing Defendants' remedial activities. J.A. 23 at ¶¶ 7-9, 11; J.A. 226–29; J.A. 559–60.

On appeal, Defendants allege that they have been acting under EPA authority for decades because the "EPA [has] direct[ed] and supervis[ed] each corrective action at the Institute Facility and each investigation of adjoining properties, including WVSU." Op. Br. at 22; *see also* J.A. 218, J.A. 220. Thus, Defendants maintain that these corrective actions were taken only "at the direction and oversight of EPA," which the "EPA itself would have performed [under CERCLA] if Defendants had not." J.A. 603. Defendants argue that the EPA has exerted "guidance or control" over Defendants since 1984 by supervising Defendants' "cleanup activities" at the Institute Facility with respect to monitoring and abating groundwater contamination. Op. Br. at 26 (quoting *Watson*, 551

U.S. at 151). In support, Defendants cite to the EPA's response to Plaintiff's public comments regarding the insufficiency of the remedial measures at the Institute Facility, where the EPA stated that the investigation and remediation activities were all taken "at the direction and oversight of EPA." J.A. 603.

Ultimately, we find Defendants' arguments unpersuasive because they would impermissibly expand the federal removal statute by blurring the line *Watson* carefully delineated where "a private firm's compliance (or noncompliance) with federal laws, rules, and regulations *does not by itself* fall within the scope of the statutory phrase "acting under" a federal "official." *Watson*, 551 U.S. at 153 (emphasis in original). Indeed, *Watson* instructs federal courts not to "expand the scope of the statute considerably, [by] potentially bringing within its scope state-court actions filed against private firms in many highly regulated industries." *Id.*

Although there is no doubt that Defendants are in a highly regulated sector, UCC's compliance with RCRA's strict regulations represents its adherence to minimum remedial measures to operate the facility for their own purpose. Unlike the archetype case, Defendants are not a private contractor hired by the federal government to complete tasks to further government projects or goals, like building military equipment or providing community medical health centers. *See, e.g., Mays v. City of Flint*, 871 F.3d 437, 448 (6th Cir. 2017) (denying federal officer removal by employees of state environmental agency charged with implementing state program authorized under Safe Drinking Water Act). Whilst true that during World War II, the Institute Facility was owned and operated by the federal government, this is no longer the case. J.A. 220; J.A. 80–81 (showing that in 1947,

26

UCC purchased the facility). Today, the Institute Facility is owned and operated by Dow Chemical, a private company, that manufactures various hydrocarbon and agricultural products for private sale. Indeed, we recently clarified this key distinction by holding that "the key lesson from *Watson* is that closely supervised government contractors are distinguishable from intensely regulated private firms because the former assist the government in carrying out basic governmental functions." *City of Baltimore I*, 952 F.3d at 463.

Furthermore, this is not a case where state courts will prejudice the federal government's interest in regulating groundwater contamination because Congress has granted all 50 states and territories the authority to implement the base RCRA program. Indeed, many states are authorized to implement additional parts of RCRA, including corrective action permitting. *See Watson*, 551 U.S. at 143 (holding that "[w]hen a company complies with a regulatory order, it does not ordinarily create a significant risk of state-court 'prejudice.' A state-court suit brought against such a company is not likely to disable federal officials from taking necessary action designed to enforce federal law, nor to deny a federal forum to an individual entitled to assert a federal immunity claim."). The goal of the RCRA is to "establish [] a viable Federal-State partnership to carry out the purposes" of the statute and to "give a high priority to assisting and cooperating with States in obtaining full authorization of State programs under" Subtitle C, which relates to hazardous solid waste management. 42 U.S.C. § 6902(a)(7). Here, for example, Defendants obtained their waste management permit from the WVDEP, *see* J.A. 564, under West Virginia's RCRA-authorized program, *see* 78 Fed. Reg. 70, 225 (Nov. 25, 2013). Although the final

27

decision to issue the CA permit may have been made by the EPA, the RCRA regulatory scheme is being implemented and overseen by a state agency. Additionally, the state is authorized to add its own permitting requirements that do not conflict with federal law. Therefore, Congress has created widespread state-federal cooperation in this area of environmental regulation. *See City of Flint*, 871 F.3d at 449 (noting that notwithstanding EPA's authority to intervene under the Safe Drinking Water Act, a state with primary enforcement authority "retains the freedom to enforce its own safe-drinking-water laws and regulations").

The case at bar is most analogous to *Watson*. In *Watson*, plaintiffs filed a state-court suit against Philip Morris, a cigarette company, claiming that it violated Arkansas consumer laws by advertising certain cigarette brands as "light" because Philip Morris illegally altered federally mandated testing results to register lower levels of tar and nicotine in the advertised cigarettes than would be delivered to consumers. 551 U.S. at 146–47. Philip Morris removed the case under the federal officer removal statute and the lower court permitted removal, holding that the case attacked Philip Morris's use of the government's method of testing cigarettes and, thus, the action involved an attack on actions taken by Philip Morris under the direction of the Federal Trade Commission ("FTC"). *Id.* The Supreme Court reversed and held that close supervision and regulation by the federal government was *not* sufficient to transform a private firm into one "acting under" a government "agency" or "officer." Second, *Watson* held that although the FTC required tobacco companies to conduct product testing, this was not a "delegation of legal authority from the FTC to the tobacco industry to undertake testing on the Government

28

agency's behalf, or evidence of any contract, payment, employer/employee relationship, or principal/agent arrangement." *Id.* at 143–44.

Like Philip Morris, Defendant UCC argues that the EPA delegated federal authority to the Defendants by requiring it to conduct investigations, cleanup activities, and take remedial measures to obtain an RCRA permit and allow it to conduct business. As the district court correctly held, this is not a delegation of federal authority. Rather, it is compliance with federal law. Like the plaintiff in *Watson*, the Plaintiff here seeks additional remedial measures under state law. Critically, and as detailed above in Section I.C., *see infra* at 7–11, after conducting its investigations, CH2M Hill recommended that Defendants obtain environmental covenants from WVSU prohibiting the use of groundwater and residential reuse. J.A. 378. Although, CH2M Hill determined that there was groundwater contamination seeping into the Rehabilitation Center, CH2M Hill's recommendation was based on WVSU's then-plan to not occupy the buildings for residential use. *See* J.A. 377; J.A. 386. Therefore, the proposed environmental covenant was a cost-efficient remedial measure to "ensure that groundwater is not used as a source of drinking water and that vapors will not migrate into future occupied buildings." J.A 378.

Thus, the key distinction here with *Watson* is that, unlike Philip Morris, Defendants here have complied with the EPA's remedial measures. Yet, despite these minimum remedial measures, the Institute Facility continues to release containments into the groundwater which migrates onto WVSU property. Accordingly, Plaintiff wants Defendants to undertake additional corrective measures which are not covered, nor barred,

29

by the EPA's measures. For example, Plaintiff wants the Defendants to compensate WVSU, remediate its property, provide protective measures for university buildings, or require monitoring of contamination on campus. Moreover, Plaintiff's allegation that the groundwater contamination is hazardous to human health, is not enough to confer federal officer jurisdiction because this fact is one that the state court can determine by relying on the EPA reports.

Furthermore, while the Institute Facility may be subject to a CA permit, WVSU is not. Therefore, Defendants cannot rely on federal authority to require that WVSU accept a restrictive environmental covenant on its property. *See* 42 U.S.C. § 6924(v); 40 C.F.R. § 264.101(c). In cases where, as here, a permittee is unable to obtain consent for offsite corrective action—in this case a restrictive covenant—the EPA's own regulation states that the permittee is "not relieved of all responsibility to cleanup a release that has migrated beyond the facility boundary where offsite access is denied." 40 C.F.R. § 264.101(c). Therefore, Plaintiff's state claims are of the kind permitted by federal law. Even assuming any good-faith attempt at obtaining the necessary restrictive-covenant from WVSU, Plaintiff alleges that Defendants have not proposed any alternative measures to address the continuing problem of groundwater contamination migrating onto WVSU's property. Since the covenant approved by the EPA is contingent upon WVSU's consent and because the EPA's regulations allow for consideration of alternative measures, Defendants cannot rely upon the EPA-approved environmental covenant as a basis to justify removal.

Additionally, Defendants' argument that the federal government would be required to take over the Institute Facility and conduct its own independent cleanup should

30

Defendants fail to abide by the remedial measures is speculative at best. Assuming, *arguendo*, that Defendants failed to meet the RCRA requirements, the EPA would not immediately take responsibility for all cleanup at the facility. Instead, the EPA would be required to comply with a detailed and lengthy procedure. For example, the EPA would be required to conduct a Remedial Investigation and Feasibility Study to, first, determine whether CERCLA action is necessary. Next, the EPA would develop a remedial action plan ("RAP"), which requires a public notice and comment period. Then, even if the EPA adopted a remedial plan, the EPA may pursue one of three possible courses of action to implement the RAP: (1) "EPA may undertake a response measure on its own, which may include removal and/or remedial action, and then sue [Potentially Responsible Parties or "PRPs"] it can find for reimbursement"; (2) "EPA may, independent of [Superfund]-financed response actions, issue an administrative order directing PRPs to implement removal or remedial action" or, alternatively, seek an injunction compelling PRPs to do so; or (3) "EPA may enter into an agreement with PRPs to perform a response action." *United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1417 (6th Cir. 1991). Critically, here, the federal government has not ordered a "cleanup" under CERCLA and has not taken over remediation responsibilities at the Institute Facility. Therefore, we need not further entertain Defendants' speculative argument because it is not factually relevant.

In all, we find that Defendants ask the Court to impermissibly expand the scope of § 1442(a)(1), in a case where they are required to comply with strict federal regulations. Thus, for the reasons mentioned above, Defendants were not "acting under" the "subjection, guidance, or control" of the federal government.

31

2.

Having found that Defendants were not "acting under" the "subjection, guidance, or control" of the federal government, we need not fully examine the remaining prongs.

B.

Defendants also allege that the district court erred in denying removal based on federal question jurisdiction under 28 U.S.C. § 1331. Here, too, we affirm the district court's holding.

1.

Generally, a case can "aris[e] under" federal law in two ways. Most directly, a case arises under federal law when federal law creates the cause of action asserted. *See American Well Works Co. v. Layne & Bowler Co.*, 241 U.S. 257, 260 (1916) ("A suit arises under the law that creates the cause of action"). However, when a claim finds its origins in state rather than federal law, federal courts have identified a "special and small category" of cases in which arising under jurisdiction still lies. *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 699 (2006). Federal courts must ask whether the "state-law claim necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable & Sons Metal Products, Inc. v. Darue Engineering & Mfg.*, 545 U.S. 308, 314 (2005). That is, "federal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn v. Minton*, 568 U.S. 251, 258 (2013). If all

four of these requirements are met, then jurisdiction is proper because there is a "'serious federal interest in claiming the advantages thought to be inherent in a federal forum,' which can be vindicated without disrupting Congress's intended division of labor between state and federal courts." *Id.* (quoting *Grable*, 545 U.S. at 313–314).

The Supreme Court has referred to two situations where federal jurisdiction could be available even though plaintiff based its claims in state court on state law: (1) when "it appears that some substantial, disputed question of federal law is a necessary element of one of the well-pleaded state claims" or (2) when it appears that plaintiffs claim is "'really' one of federal law." *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. California*, 463 U.S. 1, 13 (1983). Finally, we have clarified that "to necessarily raise a federal issue, a state law claim must hinge on the determination of a federal issue." *Burrell v. Bayer Corp.*, 918 F.3d 372, 383 (4th Cir. 2019). That is, "[t]he federal issue must be "essential to resolving a state-law claim, meaning that '*every* legal theory supporting the claim requires the resolution of a federal issue.'" *Id.* (quoting *Dixon v. Coburg Dairy, Inc.*, 369 F.3d 811, 816 (4th Cir. 2004)). If, on the other hand, the plaintiff "can establish all the necessary elements entirely independently of federal law," a federal issue is not necessarily raised. *Id.* at 382.

2.

The key question is whether WVSU "necessarily raised" or "substantially raised" a federal issue when pleading their state claims. As an initial matter, as the district court held, "defendants do not cite any federal statutes that govern a purported federal cause of action here." J.A. 619. Therefore, Defendants argue that Plaintiff's "claims seek to use

33

state law to collaterally attack the cleanup EPA directed through RCRA—including EPA's express rejection of WVSU's contention that the RCRA remedial measures the agency imposed are 'insufficiently protective' of its property." Op. Br. at 44 (quoting J.A. 603). Moreover, Defendants allege that because CERCLA set out Congress' interest in cleaning-up toxic waste, and since Plaintiff's complaint takes issue with the EPA-ordered cleanup of the Institute Facility, this confers federal question jurisdiction over the matter. Op. Br. at 44. That is, Defendants contend that Plaintiff's "artfully pled complaint" is directly attacking the EPA-directed "cleanups" and, thus, raises a federal question. *Id.* at 44–45 (quoting *Rivet v. Regions Bank of La.*, 522 U.S. 470, 475 (1998) (holding that "a plaintiff may not defeat removal by omitting to plead necessary federal questions")).

To establish that WVSU "artfully" pled a federal issue, Defendants must first establish that the EPA has ordered a "cleanup" program under CERCLA. *See Bartlett v. Honeywell Int'l Inc.*, 737 F. App'x 543, 546 (2d Cir. 2018) (affirming federal jurisdiction where lawsuit challenged EPA cleanup); *Hanford Downwinders Coal., Inc. v. Dowdle*, 71 F.3d 1469, 1482 (9th Cir. 1995) (holding that claims "challenge" EPA cleanups when they are "related to the goals of the cleanup."). Here, however, the EPA has not ordered a cleanup program under CERCLA. Thus, the Defendants are left with arguing that the EPA-approved remedial measures amount to a "cleanup" program under CERCLA, and that Plaintiff's complaint challenges this "cleanup." *See Franchise Tax Bd.*, 463 U.S. at 13 (federal jurisdiction could be available when it appears that plaintiffs claim is "'really' one of federal law.").

First, we find that Plaintiff's state claims do not challenge a "cleanup" as defined under CERCLA. Generally, Section 113(b) of CERCLA confers on the federal district courts "exclusive original jurisdiction over all controversies arising under [CERCLA]." 42 U.S.C. § 9613(b). "Cleanups" are directed by the EPA under CERCLA *after* the federal government has identified that an actor has committed toxic waste or contamination and has failed to abide by the RCRA remedial measures. In these situations, the federal government, through the EPA, engages in a "cleanup" process and is empowered to bring a series of suits to recover costs, damages, and assign liability to the responsible parties. *See, e.g.*, *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009) ("The Act was designed to promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination.") (internal quotations omitted); *see id.* at 605 (describing the case where the EPA exercised its authority under CERCLA to undertake cleanup efforts after an agricultural chemical distribution business caused toxic spills, failed to meet remedial measures, became insolvent, and, so, the federal government intervened).

Here, however, the EPA has not issued *any* "cleanup" orders.[10] Notably, in its final corrective remedial permit the EPA stated "[s]creening levels are not cleanup standard,"

---

[10]Although § 113(b) of CERCLA confers federal district courts "exclusive jurisdiction over all controversies arising under [CERCLA]," § 113(h) of CERCLA limits federal courts of this jurisdiction by providing that "[n]o Federal court shall have jurisdiction under Federal law other than under [28 U.S.C. § 1332] (relating to diversity of citizenship jurisdiction) or under State law which is applicable or relevant and appropriate (Continued)

indicating that the current level of groundwater contamination does not rise to a "cleanup standard" but does meet RCRA standards. J.A. 603.

Still, 42 U.S.C. § 9613(h) provides only five exceptions to this limit of federal jurisdiction, which as the district court correctly found, do not apply here.[11] We agree.

The first exception, under 42 U.S.C. § 9607, defines the scope of liability of CERCLA, and provides that in connection with a facility "from which there is a release, or threatened release which causes the incurrence of response costs, of a hazardous substance," four classes of persons are liable for the response costs, two of which are relevant here:

> (1) the owner and operator of a vessel or a facility, [and]
> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed[12] of.

---

. . . to review any challenges to removal or remedial action selected under [CERCLA § 104], or to review any order issued under [CERCLA § 106]." 42 U.S.C. § 9613(b), (h); *see also Hanford Downwinders Coal., Inc. v. Dowdle*, 71 F.3d 1469, 1474 (9th Cir. 1995).

[11] 42 U.S.C. § 9613(h) provides that: "(1) An action under [42 U.S.C. § 9607] to recover response costs or damages or for contribution; (2) An action to enforce an order issued under [42 U.S.C. § 9606(a)] or to recover a penalty for violation of such order; (3) An action for reimbursement under [42 U.S.C. § 9606(b)(2)]; (4) An action under [42 U.S.C. § 9659] (relating to citizens suits) alleging that the removal or remedial action taken under [42 U.S.C. § 9604] or secured under [42 U.S.C. § 9606] was in violation of any requirement of this chapter. Such an action may not be brought regarding a removal where a remedial action is to be undertaken at the site; (5) An action under [42 U.S.C. § 9606] in which the United States has moved to compel a remedial action."

[12] Pursuant to 42 U.S.C. § 6903(3), the term "disposal" or "disposed of" means "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters."

42 U.S.C. § 9607(a)(1), (2). "The statute encourages private cleanup of such hazards by providing a cause of action for recovery of costs incurred in responding to a 'release' of hazardous substances at any 'facility.'" *Nurad, Inc. v. William E. Hooper & Sons*, 966 F.2d 837, 841 (4th Cir. 1992) (citing 42 U.S.C. § 9607). The Act imposes broad and strict liability for the costs of cleaning up hazardous waste sites without regard to whether the persons assigned liability under the Act placed the waste material on the site or had knowledge of the waste materials' presence. *See United States v. Monsanto Co.*, 858 F.2d 160, 168 (4th Cir. 1988). Here, however, Defendants did not argue that Plaintiff artfully pled a claim under 42 U.S.C. § 9607 as it relates to costs for any alleged "cleanup" measures. Typically, these claims are brought by the federal government against a private party to recover "cleanup" costs.

The second, third, and fifth exceptions, under 42 U.S.C. § 9606, also do not apply because they relate to enforcing orders, recovering costs, or compelling an order that the federal government issued under CERCLA to "cleanup" the toxic waste. As the district court correctly determined, "the facility here is a RCRA site, not a Superfund [CERCLA] site . . . . [D]efendants do not provide any basis to show that the facility qualifies as a CERCLA cleanup." J.A. 620. Rather, on February 22, 2019, the EPA issued a CA Permit to the Institute Facility which constitutes compliance with [RCRA] rather than a remedial "cleanup" under CERCLA. *See* 40 C.F.R. § 270.4. Finally, the fourth exception does not apply.

At best, Defendants argue that the distinction between a CERCLA "cleanup" order and a RCRA remedial measure are "illusory and belied by the statutory text." Resp. Br. at

52. For this contention, Defendants primarily rely on two unpublished and out-of-circuit opinions, which are neither persuasive nor applicable.

First, in *N. Penn Water Auth. v. BAE Sys. Aerospace Elecs., Inc.*, plaintiff filed a state complaint under the Pennsylvania Hazardous Sites Cleanup Act in connection with the defendants' contamination of one of NPWA's production wells. No. CIV.A. 04-5030, 2005 WL 1279091, at *1 (E.D. Pa. May 25, 2005). Plaintiff, a local water utility, sought "an order requiring Defendants to provide an appropriate treatment system for Well NP-21[] and a declaratory judgment regarding Defendants' liability for future response costs involving Well NP-21. Then, pursuant to CERCLA, the EPA "initiated an investigation of groundwater contamination" throughout the site and proposed remedial action. *Id.* at *2-3. Next, the EPA declared one of NPWA's production wells a Superfund site and issued an order prohibiting use of the well for 10 years due to the contamination. Plaintiff sued in state court to begin immediate use of a water well. Plaintiff sued to have the state court overturn a federal EPA Superfund plan and filed a federal complaint which presented the same state claims in addition to two additional counts specifically asserted under CERCLA and RCRA. Thus, the federal court held that since Plaintiff was directly challenging the federal government's cleanup remedy under CERCLA, and since Plaintiff also filed an identical federal complaint (based on the same facts asserting the same injury, and asking for the same relief), there was federal question jurisdiction. *Id.* at *10.

Second, Defendants rely on *Lehman Brothers, Inc. v. City of Lodi*, where a district court found that it had federal question jurisdiction pursuant to Section 113(b) of CERCLA because "Lehman's contract-related claims have 'artfully pleaded' a federal question as

38

state law claims, namely whether the Investment Contract constitutes a 'challenge' to CERCLA." 333 F. Supp. 2d 895, 906 (E.D. Cal. 2004). Plaintiff sought to enforce a contract provision that conflicted directly with CERCLA. *Id.* at 905–06 ("Lehman's claims are, primarily, based upon the failure to perform the terms of the Investment Contract, which require a specific priority of payments disallowed by CERCLA . . . ." (footnote omitted)). As noted by *Lehman*, the Ninth Circuit found that actions challenge "CERCLA cleanups where the plaintiff seeks to dictate specific remedial actions [;] postpone the cleanup [;] impose additional reporting requirements on the cleanup [;] or terminate the RI/FS and alter the method and order of cleanup." *Id.* at 901 (internal citations omitted). Therefore, since the plaintiff's contractual provision specifically and directly challenged CERCLA, there was federal question jurisdiction.

The case at bar, however, is distinguishable from *N. Penn* and *Lehman*. Primarily, and as the district court held, the Institute Facility "is a RCRA site, not a Superfund site." J.A. 620. Also, unlike *N. Penn*, Plaintiff here has neither filed a nearly identical complaint in federal court nor is directly challenging an EPA cleanup order. Rather, Plaintiff, here, takes issue with the environmental covenant and wants additional remedies. Second, and unlike *Lehman*, there is no contractual provision in the instant case that challenges any EPA remedial or cleanup measures. Here, the EPA has not issued *any* cleanup orders.

b.

We also find that Plaintiff's state claims are not preempted by the RCRA.

Defendants' best, but, ultimately, unsuccessful, ground for conferring federal question jurisdiction is under the RCRA. With respect to RCRA suits, federal courts have

jurisdiction over citizen suits for "violation[s] of any permit, standard, regulation, condition, requirement, prohibition or order which has become effective pursuant to this chapter," or those brought against a person or entity "who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment. 42. U.S.C. § 6972(a)(1). RCRA prohibits these citizen suits if "the EPA or the state has already 'commenced and is diligently prosecuting' a RCRA enforcement action." *See United States v. State of Colo.*, 990 F.2d 1565, 1578 (10th Cir. 1993) (quoting 42 U.S.C. § 6972(b)(1)(B)).

But RCRA's authorization of these citizen suits does not preempt all state law claims. Indeed, the text of RCRA includes a citizen-suit savings clause that ensures state law claims remain unaffected:

> Nothing in this section shall restrict any right which any person (or class of persons) *may have under any statute or common law to seek enforcement of any standard or requirement relating to* the management of solid waste or hazardous waste, or to seek any other relief (including relief against the Administrator or a State agency).

42 U.S.C.A. § 6972 (emphasis added). In the instant mater, the savings clause undercuts the Defendants' argument that the Plaintiff's complaint raises a substantial federal question. The Act contemplates state law recovery separate from RCRA, as evidenced by § 6972. Plainly, Plaintiff's common law claims for negligence, public nuisance, private nuisance, trespass, strict liability, and unjust enrichment are allowed under § 6972. *See* J.A. 54–75 at ¶¶ 34-108.

Therefore, Plaintiff's suit is not challenging, or interfering with the RCRA's permitting, enforcement, or conclusions. Moreover, Defendants' remedial measures only propose an environmental covenant that would prohibit groundwater use, residential construction, and require environmental protections for non-residential buildings. The remedy approved by the EPA as to WVSU's property is contingent upon WVSU accepting a restrictive-use covenant, which WVSU is not required to grant and which it has not, in fact, agreed to. Under the EPA's regulations, WVSU's refusal to grant such a covenant now makes it incumbent upon the holder of the CA Permit, UCC, to consider and consult with authorities regarding "on-site measures to address [hazardous waste] releases" as they impact the WVSU's property. *See* 40 C.F.R. § 264.101(c). While WVSU did reject the proposed environmental covenant, it is not attacking the RCRA permitting remedial proposals. Finally, the EPA's finding that the groundwater is not harmful to human health was contingent on WVSU's non-residential use of the former rehabilitation area. So, a restrictive covenant would deprive WVSU of freely using this area for such a purpose. Thus, WVSU may seek to compel Defendants to implement additional measures to remedy Defendants' ongoing contamination on WVSU property and to obtain damages for losing present and future use of the former rehabilitation area subject to the environmental covenant.

Accordingly, Plaintiff's state claims do not turn on any questions of federal law, as contemplated by the Supreme Court in their development of this doctrine. *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 681–700 (2006). The state court will address whether Defendants should do more to remedy its contamination on WVSU

41

based on theories of negligence, public nuisance, private nuisance, trespass, strict liability, and unjust enrichment. J.A. 54–75 at ¶¶ 34-108. Plaintiff's claims do not draw on federal law as the exclusive basis, or as any basis, for holding Defendants liable for their actions. *Compare MSOF Corp. v. Exxon Corp.*, 295 F.3d 485, 490 (5th Cir. 2002) ("[C]laims for negligence and strict liability arose out of alleged contamination of plaintiffs' land with toxic chemicals, which undisputedly gave rise to a cause of action under state law"), with *Bd. of Comm'rs of Se. Louisiana Flood Prot. Auth.-E. v. Tennessee Gas Pipeline Co., L.L.C.*, 850 F.3d 714, 722 (5th Cir. 2017), *cert. denied sub nom. Bd. of Comm'rs of Se. Louisiana Flood Prot. Auth.–E. v. Tennessee Gas Pipeline Co.*, No. 17-99, 2017 WL 4869188 (Oct. 30, 2017) ("Here, however, Defendants correctly point out that the Board's complaint draws on federal law as the exclusive basis for holding Defendants liable for some of their actions").

c.

We need not examine the remaining prongs because none of Plaintiff's state law claims turn on an "actually disputed and substantial' issue of federal law." *Grable*, 545 U.S. at 314. Rather, WVSU's claims turn on questions of pure state law, including traditional tort law, questions of duty, breach, causation, and damages.[13] There is no need for a federal court to interpret any substantial issues of federal law even if the meaning of

---

[13] *See Giles v. Chicago Drum, Inc.*, 631 F. Supp. 2d 981, 989–90 (N.D. Ill. 2009) (remanding case even where resolution of the conspiracy claim may interpret and apply RCRA terms governing the lawfulness of defendants' conduct); *DeLuca v. Tonawanda Coke Corp.*, No. 2:10-cv-0859, 2011 U.S. Dist. LEXIS 96110, at *14-16 (W.D.N.Y. Aug. 25, 2011) (remanding case asserting only state law claims despite existence of related RCRA investigation and enforcement).

certain RCRA terms "may well be hotly contested." *Giles v. Chicago Drum, Inc.*, 631 F. Supp. 2d 981, 989 (N.D. Ill. 2009). As noted above, Congress allows private rights of action in state courts even if they implicate the RCRA. Thus, "Congress's decision to grant a private right of enforcement and its silence with respect to any other private cause of action allows for the inference that it intended to keep RCRA-based state law claims for conspiracy and negligence out of federal court." *Id.* at 990; *see also Bennett v. Southwest Airlines Co.*, 484 F.3d 907, 911 (7th Cir. 2007).

Therefore, for the reasons stated above, there is no federal question jurisdiction.

IV.

For the foregoing reasons, we hold that 28 U.S.C. § 1442 does not confer federal officer jurisdiction over Plaintiff's state suit because Defendants were not "acting under" the "subjection, guidance, or control" of the EPA. Second, we hold that there is no federal question jurisdiction, pursuant to 28 U.S.C. § 1331, over WVSU's state claims because they are neither challenging an EPA-directed "cleanup" under CERCLA nor arise from RCRA remedial measures and, thus, are not preempted.

*AFFIRMED*